BONNETT, FAIRBOURN, FRIEDMAN
   & BALINT, P.C.
Andrew S. Friedman (*Pro Hac Vice pending*)
Elaine A. Ryan (*Pro Hac Vice pending*)
Tonna K. Farrar (CA Bar No. 237605)
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
E-mail afriedman@bffb.com
Telephone: (602) 274-1100

GLAST, PHILLIPS & MURRAY, P.C.
Michael C. Dodge (*Pro Hac Vice pending*)
2200 One Galleria Tower
13355 Noel Road, L.B. 48
Dallas, Texas 86350
E-mail mdodge@gpm-law.com
Telephone: (972) 419-8300

LITE, DePALMA, GREENBERG
   & RIVAS, LLC
Bruce D. Greenberg (*Pro Hac Vice pending*)
Jennifer Sarnelli (*Pro Hac Vice pending*)
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
E-mail bgreenberg@ldgrlaw.com
Telephone: (973) 623-3000

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN PODIATRIC MEDICAL ASSOCIATION, CALIFORNIA CHIROPRACTIC ASSOCIATION, CALIFORNIA PSYCHOLOGICAL ASSOCIATION, and DR. JAMES A. PECK, PSY.D., individually and on behalf of all other similarly situated individuals, <br><br> Plaintiffs, <br><br> v. <br><br> WELLPOINT, INC., <br><br> Defendant. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br><br><br> Demand For Jury Trial |

For their complaint, Plaintiff DR. JAMES A. PECK, PSY.D. (the "Individual Plaintiff"), on behalf of himself and all others similarly situated, and Plaintiffs AMERICAN PODIATRIC MEDICAL ASSOCIATION ("APMA"), CALIFORNIA CHIROPRACTIC ASSOCIATION ("CCA"), and CALIFORNIA PSYCHOLOGICAL ASSOCIATION ("CPA") (collectively, the "Associational Plaintiffs"), on behalf of their membership, bring this action against Defendant WELLPOINT, INC., ("WellPoint" or "Defendant"), and allege as follows:

## I.    NATURE OF THE CASE

1.    This is a class action seeking redress for WellPoint's unlawful practice of systematically underpaying "out-of-network" non-MD health care providers ("out-of-network providers") for their services.  Patients covered under WellPoint's health plans (aka "insureds") have the option of using health care providers who are "in-network" or "out-of-network."   In-network health care providers have agreed with WellPoint to accept pre-negotiated reimbursement rates as payment in full for their services.  Out-of-network providers are not so limited and are entitled to be paid by WellPoint at the "usual, customary and reasonable" ("UCR") rate.

2.    WellPoint is the country's leading health care benefits company, insuring and administering individual and commercial (employer sponsored) health benefits. WellPoint provides, *inter alia*, health and behavioral health benefits, mostly through employer-sponsored health benefit plans, throughout the United States to more than 35 million individuals.  WellPoint also is a Blue Cross or Blue Shield licensee in 14 states, including California.

3.    WellPoint uses or used claims-support databases created by Ingenix, Inc., a wholly owned subsidiary of UnitedHealthcare Group, Inc., one of the nation's largest insurers, to calculate the UCR rate for out-of-network providers.  An investigation by the New York Attorney General, Andrew Cuomo, revealed that Ingenix's databases are

intentionally skewed to lower the UCR rates through, *inter alia*, faulty data collected, poor pooling procedures and the lack of audits to ensure the integrity of the data collected from WellPoint and other insurers. Cuomo's investigation concluded that use of UCR rates obtained through Ingenix's databases resulted in underpayments of as much as 10-28%.

4. Following on the heels of the attorney general investigation, on March 26 and 31, 2009, Senator John D. Rockefeller, IV, presided over Senate hearings investigating health insurers' out-of-network rate practices. The Senate weighed evidence that health insurers had routinely underpaid their insureds for out-of-network health care. The chief executives of UnitedHealthcare and Ingenix were questioned about the quality of Ingenix's databases and, specifically, about "data laundering" – the selective use of doctors' bills to determine out-of-network payments. Senator Rockefeller characterized the insurers' out-of-network rate practices as "outright fraud" and said the hearings were meant to determine whether more federal oversight of insurers is necessary to protect consumers.

5. Most of the Ingenix data used by insurers to determine UCR amounts was supplied by Ingenix's parent company and Aetna. These insurers recently agreed to pay $70 million to set up a new database for determining UCR reimbursement amounts. WellPoint was also investigated by the New York Attorney General and agreed to make a $10 million contribution to the development of the new database program and to stop using the Ingenix databases. The new database will be owned and operated by a non-profit organization to eliminate insurance company conflicts of interest. However, the creation of this new database does not fix the years of underpayments that WellPoint already has made to out-of-network providers. As a result of WellPoint's use of Ingenix to set UCR rates, out-of-network providers have been short-changed millions of dollars that they were entitled to be and should have been paid.

6.     In addition, WellPoint's systematic underpayment of out-of-network providers resulting from its reliance on Ingenix and other faulty data had the intended effect of discouraging its insureds from choosing to use of out-of-network providers because, *inter alia*, by improperly lowering out-of-network reimbursements WellPoint thereby increased unpaid amounts for which its insureds would be financially responsible.   WellPoint's serial underpayment of out-of-network UCR amounts also pressured health care providers who otherwise would have remained out-of-network to join WellPoint's network of providers and accept WellPoint's discounted contract reimbursement rates.

7.     Individual Plaintiff is an out-of-network Clinical Psychologist who was both underpaid and lost existing and potential patients by WellPoint's use of Ingenix's databases to process his claims.   He brings this class action on behalf of all out-of-network health care providers practicing in the United States who are not licensed medical doctors and who, during the applicable limitations period, submitted claims for payment of their health care services to WellPoint and were paid less than the amount submitted on their claim (collectively, the "Class" or "Class Members").   Individual Plaintiff alleges that WellPoint's wrongful underpayments violated its legal obligations to him and the Class, as assignees and beneficiaries of their patients' benefits, under the Employee Retirement Income Security Act of 1974 ("ERISA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and the Sherman Antitrust Act, as described herein.

8.     The Associational Plaintiffs bring this case on their own behalf and/or on behalf of their membership of non-MD health care providers.   The Associational Plaintiffs are dedicated to advocating for the rights of health care providers and patients alike for the delivery of the highest quality of medical care.   All of the Associational Plaintiffs bring this action on behalf of their members who have been injured as a result

of the egregious acts and practices of WellPoint as set forth in this Complaint. Accordingly, as set forth below, the Associational Plaintiffs allege violations of ERISA, RICO and the Sherman Antitrust Act on behalf of their membership against WellPoint.

9.     The Individual Plaintiff and the Associational Plaintiffs are collectively referred to herein as "Plaintiffs."

10.     During the Class Period, WellPoint used other faulty methods for determining UCR when Ingenix data was unavailable.

11.     Whether it used Ingenix data or another flawed methodology to price UCR, WellPoint routinely and systematically underpaid out-of-network providers who submitted claims for reimbursement for out-of-network services.

12.     WellPoint's deceitful and pervasive business practices forced Plaintiffs and the Class to expend significant time and resources towards identifying, disputing and then appealing WellPoint's improper reimbursement determinations, oftentimes still resulting in underpayment. WellPoint's conduct violated its legal obligations to the Individual Plaintiffs and the Class, as assignees and beneficiaries of their patients' benefits, and violated federal and state law as described herein, causing Plaintiffs and the Class significant financial harm.

13.     Plaintiffs seek declaratory, injunctive, and restitutionary relief, damages and treble damages, and other remedies for WellPoint's unlawful conduct.

## II.     JURISDICTION AND VENUE

14.     ERISA governs the rights and duties of insurance companies and WellPoint's insureds of employer sponsored health care plans.  29 U.S.C. § 1132.  This Court has jurisdiction of those claims under 29 U.S.C. § 1132(e).   Subject matter jurisdiction also exists under both 28 U.S.C. § 1331 and §1332(d).

15.     Venue is appropriately established in this District under 29 U.S.C. § 1132(e)(2), 28 U.S.C. § 1391, § 1965 of RICO, and 18 U.S.C. § 1965, because

WellPoint conducts a substantial amount of business in this District and insures and administers health plans both inside and outside of this District.

## III.   THE PARTIES

*The Individual Plaintiff*

16.   Plaintiff DR. JAMES PECK, PSY.D., is a Clinical Psychologist who specializes in treating individuals with co-occurring mental health and substance abuse disorders, and individuals with HIV/AIDS and co-occurring mental health and/or substance abuse disorders.  In addition to his work at UCLA, Dr. Peck also maintains a separate private practice in Santa Monica, California.  He is a resident of the State of California and is licensed to practice psychology in California.  At all relevant times, Dr. Peck's only affiliation with WellPoint was as an out-of-network non-MD health care provider.  Dr. Peck is referred to herein as the "Individual Plaintiff."

*The Associational Plaintiffs*

17.   Plaintiff AMERICAN PODIATRIC MEDICAL ASSOCIATION ("APMA") was founded in 1912 and is headquartered in Bethesda, Maryland.  The APMA is a national non-profit membership organization that represents the interests of the vast majority of the estimated 15,000 podiatrists in the United States as well as their patients located in California and throughout the country.  APMA appears herein on behalf of its membership and has associational standing on behalf of its members who have claims against WellPoint for the violations alleged in this complaint and on their behalf seeks declaratory and injunctive relief.  APMA engages in the legislative, judicial, political and regulatory processes to carry out its mission.

18.   Plaintiff CALIFORNIA CHIROPRACTIC ASSOCIATION ("CCA") is headquartered in Sacramento, California.  The CCA is a statewide non-profit membership organization established in 1928 that represents the interests of chiropractic doctors and allied industries as well their patients located in California.  Its mission is

to "[p]romote high standards of professionalism and patient care through education, advocacy and accountability." CCA engages in the legislative, educational, political and regulatory processes to carry out that mission. CCA appears herein on behalf of its membership and has associational standing on behalf of its members who have claims against WellPoint for the violations alleged in this complaint and on their behalf seeks declaratory and injunctive relief.

19. Plaintiff CALIFORNIA PSYCHOLOGICAL ASSOCIATION ("CPA") is headquartered in Sacramento, California. The CPA is a statewide non-profit membership organization established in 1948 that represents the interests of psychologists and their patients in California. CPA appears herein on behalf of its membership and has associational standing on behalf of its members who have claims against WellPoint for the violations alleged in this complaint and on their behalf seeks declaratory and injunctive relief. CPA is an advocate for its members and their patients and engages in the necessary legislative, judicial, political and regulatory processes to carry out its mission. CPA has sponsored many legislative proposals that have resulted in greater access to mental health care services for patients and extended protection of the rights of psychologists to practice to the full extent allowed by law. Individual Plaintiff Dr. Peck is an active member of CPA.

## IV. THE DEFENDANT

20. Defendant WELLPOINT, INC. ("WellPoint") was created in or around 2004 by the merger of California-based WellPoint Health Networks, Inc. with Indianapolis-based Anthem, Inc. The merged companies changed their name to WellPoint, Inc. on or about November 30, 2004. WellPoint has its corporate headquarters at 120 Monument Circle, Indianapolis, Indiana 46204. As the successor entity to Anthem, Inc., WellPoint, Inc. is liable for Anthem's actions both before and after the merger between the two companies.

21.     WellPoint is the largest health benefits company in terms of health care membership in the United States with 35 million medical members as of December 31, 2008. WellPoint is an independent licensee of the Blue Cross and Blue Shield Association, or BCBSA, an association of independent health benefit plans.  WellPoint serves as the Blue Cross licensee for California and as the Blue Cross and   Blue Shield, or BCBS, licensee for: Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (as BCBS in 10 New York city metropolitan and surrounding counties, and as Blue Cross or BCBS in selected upstate counties only), Ohio, Virginia (excluding the Northern Virginia suburbs of Washington, D.C.), and Wisconsin.  In a majority of these service areas, WellPoint does business as Anthem Blue Cross, Anthem Blue Cross Blue Shield or Empire Blue Cross Blue Shield (in its New York service areas). WellPoint also serves members throughout the country as UniCare. WellPoint is licensed to conduct insurance operations in all 50 states through its subsidiaries.  WellPoint serves customers throughout the United States under various names and operates, trades or otherwise does business through a variety of subsidiary companies and/or affiliates including, but not limited to, the following: Anthem BlueCross and BlueShield Plan Administrator, LLC; Anthem Blue Cross Blue Shield Partnership Plan, Inc.; Anthem Blue Cross Life and Health Insurance Company; Health Plans of Kentucky, Inc., d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of Maine, Inc., d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of New Hampshire, Inc., d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of Virginia, Inc., d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans, Inc., d/b/a Anthem Blue Cross and Blue Shield; Anthem Insurance Companies, Inc., d/b/a Anthem Blue Cross and Blue Shield; Anthem Life Insurance Company; Anthem Life & Disability Insurance Company; Blue Cross and Blue Shield of Georgia, Inc.; Blue Cross Blue Shield Healthcare Plan of Georgia,

Inc.; Blue Cross Blue Shield of Wisconsin, d/b/a Anthem Blue Cross and Blue Shield; Blue Cross of California, d/b/a Anthem Blue Cross; Blue Cross of California Partnership Plan, Inc., d/b/a Anthem Blue Cross Partnership Plan; Claim Management Services, Inc., d/b/a Anthem Blue Cross and Blue Shield; Community Insurance Company, d/b/a Anthem Blue Cross and Blue Shield; Compcare Health Services Insurance Corporation, d/b/a Anthem Blue Cross and Blue Shield; Empire HealthChoice Assurance, Inc., d/b/a Empire BlueCross BlueShield; Empire HealthChoice HMO, Inc., d/b/a Empire BlueCross BlueShield HMO; Golden West Health Plan, Inc.; HealthKeepers, Inc.; Healthy Alliance Life Insurance Company d/b/a Anthem Blue Cross and Blue Shield; HMO Colorado, Inc.; HMO Colorado, Inc., d/b/a HMO Nevada; HMO Missouri, Inc., d/b/a Anthem Blue Cross and Blue Shield; Machigonne, Inc.; Matthew Thornton Health Plan, Inc., d/b/a Anthem Blue    Cross and Blue Shield; Peninsula Health Care, Inc.; Priority Health Care, Inc.; RightCHOICE Managed Care, Inc., d/b/a Anthem Blue Cross and Blue Shield; Rocky Mountain Hospital and Medical Service, Inc., d/b/a Anthem Blue Cross and Blue Shield; UNICARE Health Insurance Company of Texas; UNICARE Health Insurance Company of the Midwest; UNICARE Health Plan of Kansas, Inc.; UNICARE Health Plan of West Virginia, Inc.; UNICARE Health Plans of Texas, Inc.; UNICARE Health Plans of the Midwest, Inc.; UNICARE Life & Health Insurance Company; UNICARE of Texas Health Plans, Inc.; WellChoice Insurance of New Jersey, Inc.  WellPoint acts through its subsidiaries or affiliates with respect to the practices at issue in this case.

22. WellPoint and its subsidiaries and affiliates are collectively referred to herein as "WellPoint" or "Defendant."

. . .

. . .

. . .

# V. FACTS COMMON TO ALL COUNTS

### A. *Out-of-Network Non-MD Health Care Providers.*

23. Non-MD health care providers can either enter into an agreement with WellPoint, in which case they are deemed "in-network," or they can provide services to WellPoint's insureds without any contract with WellPoint governing that relationship, in which case they are deemed "out-of-network."

24. Non-MD health care providers who are in-network have signed contracts with WellPoint to provide health care services to its insureds at reduced rates in exchange for access to WellPoint's patient base, among other things. In-network providers receive reimbursement of eligible charges directly from WellPoint. When visiting an in-network provider, insureds are only responsible for co-payments, co-insurance, and payment for non-covered items (if any) at the time of service. WellPoint usually pays less money when its insureds use an in-network provider, because those providers have agreed to provide their services at a lower cost to WellPoint's insureds.

25. Out-of-network providers are non-MD health care providers who do not have a contract to provide health care services to WellPoint's insureds. Because no specific reimbursement rate has been agreed to by the provider, out-of-network providers are not required to accept reduced rates for their services and can instead charge any amount they choose. Out-of-network providers may then collect their full charges directly from patients at the time of service or may agree to accept an assignment of benefits, which occurs when an insured authorizes their insurance company to remit payment directly to the health care provider for the covered services. Out-of network providers are entitled to bill the patient for any amount exceeding the amount covered by insurance.

26. While out-of-network providers may bill the retail cost of their services, WellPoint does not necessarily pay the total amount billed. Rather, WellPoint pays on a

fee for service basis that is equal to the lesser of the out-of-network provider's billed charges or a percentage of the UCR amount as determined by WellPoint.

27.     The UCR amount is supposedly determined based on a review of the prevailing charges made by peer health care providers for a particular medical or health service by a specific type of physician within a specific community or geographical area. The UCR amount is the maximum amount WellPoint will consider eligible for reimbursement to out-of-network providers (the so-called "allowed charge"), and is typically determined by WellPoint through its use of the Ingenix databases, although occasionally by the use of Medicare data.

**B.      *The Ingenix Databases.***

28.     WellPoint primarily calculates UCR rates for out-of-network providers by using databases that are owned and operated by a third party, Ingenix, Inc. ("Ingenix"). Ingenix is owned by America's largest health insurance company, UnitedHealthcare Group. These databases are known as the Prevailing Healthcare Charges System ("PHCS"), which Ingenix purchased in 1997, and Medical Data Research ("MDR"), which Ingenix purchased in 1998 (collectively, "Ingenix databases").

29.     The PHCS database was produced and has been marketed to insurers, including WellPoint, since 1973. However, its prior owner, Health Insurance Association of America ("HIAA"), informed WellPoint and other data purchasers that it was not endorsing, approving, or recommending the use of any of its data for any particular purpose.  In fact, HIAA released its data with a disclaimer that specifically stated, in relevant part, that the data was being provided to members [i.e., insurers such as WellPoint] for informational purposes only.  HIAA disclaimed any endorsement, approval or recommendation of the data, or its use to determine "usual and customary" charges.  Once Ingenix acquired PHCS from HIAA in 1998, it continued to use

substantially the same disclaimer in its communications with insurers including WellPoint, as set forth in paragraph 37 below.

30. Ingenix produces two cycles of data a year, which include medical, surgical, anesthesia, and dental data as well as the HealthCare Financing Administration's common procedure coding system services ("HCPCS").

31. The Ingenix databases are purportedly designed to collect and report actual charge data by health care providers for out-of-network health care services from which UCR amounts can be determined. For some services, the Ingenix databases feature "derived data," which uses relative values and averages charges for a number of procedures in the same "bodily area" as the procedure for which a derived amount is calculated.

32. The Ingenix databases are based on charge data contributed to Ingenix by health plans, including UnitedHealthcare (the parent company of Ingenix), Aetna, WellPoint, and other insurance payors who also use the final published data to price out-of-network claims as UCR.

33. Certain data contributors, including WellPoint, send less-than-complete and/or extensively pre-edited charge data to Ingenix, skewing the data downward to the detriment of out-of-network providers like Individual Plaintiff whose UCR rates are artificially lowered by insurers using the Ingenix databases. Ingenix was aware of the pre-editing and other improper practices engaged in by its data contributor health plans. Nevertheless, Ingenix failed to audit its data contributor health plans or take other steps to ensure completeness and accuracy of their data. In addition, Ingenix itself also extensively edited this data, which further contributed to its invalidity and inaccuracy.

34. Whenever WellPoint uses the Ingenix databases to determine UCR amounts, WellPoint relies on the Ingenix data alone and gives no consideration to the increased severity or complexity of a specific case, which is necessary for a proper

determination of the UCR amount. WellPoint systematically failed to disclose this critical information to Plaintiff, the Class, its insureds and regulators.

35.     WellPoint also systematically failed to advise its insureds and out-of-network providers that the Ingenix data it used to establish UCR amounts is produced with the following disclaimer:

> The Ingenix data, whether charge data or conversion factor data, are provided to insureds for informational purposes only. Ingenix, Inc. disclaims any endorsements, approval, or recommendation or particular uses of the data. There is neither a stated nor an implied 'reasonable and customary' charge (either actual or derived). . . . Any interpretation and/or use of the data by the subscriber is solely) and exclusively at the discretion of the subscriber.

36.     Even though Ingenix informed WellPoint and other data users that they cannot "represent" the Ingenix data other than as described in the disclaimer, WellPoint used and represented the Ingenix data inconsistently with the disclaimer as being an accurate method for determining UCR amounts.

37.     Throughout the Class Period, WellPoint used the Ingenix data as its primary basis for making its UCR determinations, even though WellPoint knew or should have known that the data could not and should not have been used for that purpose and, as with the Medicare data, was not properly designed to determine UCR reimbursement amounts.  WellPoint obtained the data from Ingenix, loaded the data onto its internal claims-processing platforms, accessed that data and resolved claims automatically based on that data, through auto-adjudication – an automated, paperless and human-less process.

38.     WellPoint's claims processors simply entered certain claim information into their computers to access the Ingenix databases, which then displayed a dollar amount Ingenix calculated for each procedure code at the applicable percentage. WellPoint used this Ingenix amount as the UCR amount.

39.     There are a number of inherent flaws in the Ingenix data that make it an invalid and inappropriate basis for setting UCR amounts, chief among them the data only includes four points: date of service, CPT Code, address where service was performed, and the amount of the provider's billed charges.  In addition, the Ingenix database:

(a)     Does not determine the numbers or types of providers in any geographic area;

(b)     Does not determine the actual types of procedures within a geographic area;

(c)     Collects charge data that is not representative of the actual number of procedures performed within a geographic area;

(d)     Does not collect sufficient data to enable its users to determine whether the data reflects the charges of providers with any particular degree of expertise or specialization;

(e)     Does not collect sufficient provider-specific data to enable its users to determine whether the charges are from one provider, from several providers, or from only a minority or specific subset of the providers in a geographic area;

(f)     Does not collect patient specific information such as age or medical history or condition;

(g)     Does not ascertain the most common charge for the same service or comparable service or supply;

(h)     Does not determine the place of service or type of facility;

(i)     Does not collect sufficient data to enable it or its users to determine an appropriate medical market for comparing like charges;

(j)     Combines zip codes inappropriately, and uses zip codes instead of appropriate health care markets;

(k)     Fails to compare procedures that use the same or similar resources (and other costs) to the provider but, rather, indiscriminately combines all provider charges by procedure code without regard to such factors;

(l)     Fails to compare procedures of the same or similar complexity by, among other things, failing to record or account for CPT code modifiers;

(m)     Does not use an appropriate statistical methodology;

(n)     Does not properly consider charging protocols and billing practices generally accepted by the health care community or specialty groups;

(o)     Does not properly consider health care costs in setting geographic areas;

(p)     Lacks quality control, such as basic auditing, to ensure the validity, completeness, representativeness, and authenticity of the data submitted;

(q)     Is subject to pre-editing by data contributors;

(r)     Is subject to additional editing by Ingenix;

(s)     Reports charges that are systemically skewed downward;

(t)     Uses relative values and conversion factors to derive inappropriate UCR amounts;

(u)     Uses a methodology that does not comply with WellPoint's contractual definition of UCR;

(v)     Purports to be confidential and/or proprietary, which prevents access to, and scrutiny of, the data by non-MD health care providers, insureds or their employers;

(w)     Cannot determine from its pooled data the number or percentage of providers furnishing billed charge data;

(x)     Fails to consider the provider's usual charge;

(y)     Lacks the ability to incorporate into its analysis the provider's licensure, specialty training, or experience;

(z)     Does not account for the complexity of a patient's specific treatment or condition or the degree of skill or expertise needed for the particular service;

(aa)    Fails to collect data regarding the range of services or supplies provided by a facility; and

(bb)    Does not collect data regarding rates based on cost factors or the cost of providing the same or similar service or supply or the prevailing charge level for any provider or service.

40.     These and other flaws render WellPoint's use of Ingenix data invalid and unlawful for determining UCR amounts. WellPoint knew or should have known of these flaws in the Ingenix data. WellPoint recognized the overwhelming problems

involved with using Ingenix's databases to calculate UCR amounts due to Ingenix's failure to collect or utilize data other than the four data points. WellPoint and Ingenix (and HIAA) discussed expanding the data to include more data points. Ingenix attempted to collect additional data, but was unable to get additional data from all of its data contributors, and did not incorporate the data it did receive into its databases.

41.     Nevertheless, WellPoint continued to use Ingenix's faulty databases, without advising its insureds or providers of the many flaws in the Ingenix data, including its use of only four data points.

42.     In using the Ingenix data, WellPoint elevated its own financial self-interest over the best interests of its insureds and their providers. When deciding a claim for out-of-network benefits, WellPoint operates under a conflict of interest. First, every dollar paid to an out-of-network provider is one less dollar for WellPoint, so it systematically and without justification is encouraged to and does reduce the value of out-of-network benefits through the use of Ingenix products. Second, WellPoint's core product is its network of non-MD health care providers, which it attempts to preserve by discouraging the use of out-of-network providers by systematically and without justification reducing the amount it will pay for out-of-network benefits by using Ingenix to lower the UCR amounts for out-of-network providers. In other words, the more an insured has to pay to go to an out-of-network provider over an in-network provider, the more likely that insured is to stay in-network.

43.     During the Class Period, WellPoint improperly used the Ingenix databases to set reimbursement rates for out-of-network claims in the following ways, resulting in adverse benefit determinations that damaged Plaintiffs and the Class:

> (a)     By using Ingenix data from a different geographic area if there was no Ingenix provider charge data available for the geographic area where a particular service was rendered to an insured.

> (b)     By using outdated versions of the Ingenix databases to determine UCR amounts for its insureds.

(c)      By setting UCR amounts for out-of-network claims knowing that some Ingenix data contributors, including WellPoint, deleted "high" provider charges for health care services from the data they submitted to Ingenix for use in the Ingenix databases.

(d)      By setting UCR amounts for out-of-network claims knowing that Ingenix further had manipulated its databases by deleting (i) additional valid "high" charges by non-MD health care providers and (ii) significantly more "high" charges than "low" charges.

(e)      By setting UCR amounts for out-of-network claims knowing that Ingenix had deleted from its databases provider charges that contained health care claim coding "modifiers," which indicate procedures or services with special complications that often warrant a higher UCR amount.

(f)      By setting UCR amounts for out-of-network claims knowing that Ingenix failed to audit the data it received from data contributor health plans to ensure that they had submitted all appropriate data and had not improperly reported negotiated or discounted rates that providers charged for health care services rather than charges actually billed by providers.

(g)      By setting UCR amounts for out-of-network claims knowing that Ingenix used a deficient methodology to "derive" additional provider charges in the databases beyond the charges actually reported by Ingenix data contributor health plans to Ingenix. Ingenix's use of defective data to "derive" such additional provider charges caused the resulting rates to be defective and improper for use in setting reimbursements for health care services.

44.    During this period, WellPoint also, to a lesser extent, set UCR rates based on Medicare rate data.  As with the Ingenix databases, this Medicare data was not designed to and could not establish valid UCR amounts.  Such rates are therefore not a proper or legitimate method for reducing Plaintiff's and the Class Members' claimed amounts.

45.    By systematically and typically making UCR determinations without compliant and valid data to substantiate its determinations, WellPoint has breached its obligation to reimburse Plaintiffs and the Class for the out-of-network services they provide to WellPoint's insureds.  Accordingly, all past UCR determinations based on such noncompliant data should be overturned.

46. As a further means of reducing out-of-network reimbursement to out-of-network providers during the Class Period, WellPoint knowingly used outdated or "old" Ingenix data to price out-of-network claims.

47. WellPoint also sometimes did not use the Ingenix data if that data did not report a certain number of charges for a given CPT code, instead applying its own claims platform to determine the UCR amount if the number of charges in the Ingenix data triggered the use of its default formula. At times, these platforms utilized out of date data and data even more flawed than ordinary Ingenix data to determine the UCR amount.

48. Additionally, if the Ingenix data failed to provide the minimum number of data points, WellPoint's claim systems applied WellPoint's own "default" formulas to calculate the UCR during the Class Period.

49. WellPoint did not disclose that it used "default" formulas to establish UCR amounts during the Class Period. In fact, WellPoint insureds as well as Plaintiffs and the Class had no way of knowing that a "default" formula had been used to price UCR, nor the method inherent in such default formula. Indeed, WellPoint referred to one of its default formulas as a "behind-the-scenes" program, and in September 2001, WellPoint personnel described a "behind-the-scenes" program to calculate UCR as follows:

> Yes, you can say that if we receive less than 10 reportings [charges] on a SURGICAL procedure, a behind-the-scenes-programs [sic] calculates the U&C amount by averaging the reportings for all zips associated with that procedure that have more than 4 reportings. If there are less than 4 reportings for all zips associated with the procedure, then the procedure does not get updated at all.
>
> As for how it gets different amounts for the different zips, Step 5 is where that happens. Factors are calculated for the mean and each of the percentiles for each zip area. Then, Step 6 multiplies those factor amounts by the Relative Value for the procedure to get the amounts that are updated to the database for each zip.

> Please let me know if this helps. I know that it is 'clear as mud' and I will try to get you a more 'user friendly' explanation of this process as soon as I can get around to it.

50. WellPoint also fails to advise health care providers, like Plaintiffs and the Class, when it has used a "default" formula or other "behind-the-scenes" program to price UCR, which violate its obligations to both its insureds and the health care providers.

51. During the Class Period, WellPoint also uses or used a claims platforms that applied different rounding rules for establishing UCR rates, which resulted in WellPoint calculating inconsistent UCR amounts despite the fact that the calculations were made for the same date, same procedure in the same geographic area.

52. By using Ingenix data and other improper out-of-network pricing methods to reduce reimbursements during the Class Period, WellPoint violated, and continues to violate, its legal obligations to Plaintiffs and the Class.

53. WellPoint failed to disclose and misrepresented to Plaintiffs and the Class material information regarding out-of-network determinations in violation of ERISA, RICO, the Sherman Antitrust Act, and federal common law. By not providing Plaintiffs and the Class an accurate explanation of the basis for their UCR or other out-of-network determinations, WellPoint failed to provide the "full and fair review" required by ERISA. WellPoint has also illegally agreed with Ingenix that neither will disclose the Ingenix database information so that they can conceal the defects from insureds and providers alike.

54. WellPoint violated various fiduciary, statutory, and common law duties to Plaintiffs and the Class by not providing a full and fair appeals process and the underlying data on which they purportedly relied on to deny their assigned benefits, and by failing to make decisions untainted by their own self-interest.

. . .

### C. Investigations into the Ingenix databases.

55. A recently concluded investigation of Ingenix's databases by New York Attorney General, Andrew Cuomo, confirmed that "the Ingenix databases in fact under-reimburse consumers." January 13, 2009 New York Attorney General Health Care Report, "THE CONSUMER REIMBURSEMENT SYSTEM IS CODE BLUE," available at: http://www.oag.state.ny.us/bureaus/health_care/HIT2/pdfs/FINALHIT IngenixReportJan. 13, 20 2009.pdf.

56. According to the Attorney General's report, an analysis of the New York market showed that insurers that used Ingenix and other similar methods to determine UCR "systematically under-reimburse New Yorkers for doctor's office visits." Id.

57. "When extrapolated across the State and the country, it is fair to say that the Ingenix databases have caused Americans to be under-reimbursed to the tune of at least hundreds of millions of dollars over the past ten years." *Id*. Non-MD health care providers, like Plaintiffs and the Class, and the insureds, of course, are the primary victims of this under-reimbursement scheme.

58. Moreover, WellPoint's continuous underpayment of out-of-network claims has interfered with Plaintiff's and the Class' relationships with their patients, the insureds. Mr. Cuomo agreed:

> The responsible consumer reads the plan documents and sees a thicket of words. One term seems intelligible: the "usual and customary rate" of a similar physician for a similar service in a similar area. That sounds reasonable. The consumer makes the leap out-of-network and submits the bill to the insurer, only to be told the consumer will not be fully reimbursed because the doctor's charge exceeded the usual and customary rate. The fog of ignorance continues, thanks to the insurer. The physician-patient relationship is undermined, as the physician has been branded a charlatan whose bills are inflated. No one's interests here are advanced, except perhaps when next time, the consumer decides to stay in network for fear of what bills may accrue for out-of-network care. The interests advanced in that event are those of the insurer, whether by accident or design.

*Id.*

59. In discussing where the blame for this under-reimbursement scheme should lie, the New York Attorney General explained: "[T]he fault cannot be laid on Ingenix alone. All industry members have benefited unfairly at the expense of consumers over the past ten years, and they continue to benefit unfairly from a rigged system day after day." Id. WellPoint, as a significant beneficiary of the Ingenix database, should therefore be held accountable for its use of the database to under-reimburse Plaintiffs and the Class.

60. Simultaneous with or soon after the release of the New York Attorney General's findings, UnitedHealthcare, the owner of the Ingenix database, and 10 other insurers settled the New York Attorney General's, and the American Medical Association's ("AMA") and others' claims concerning insurers' use of Ingenix's databases to determine UCR amounts. As part of the attorney general settlements, WellPoint agreed to pay $10 million toward the creation of an independent non-profit organization to develop, own and operate a new database to be used for UCR determinations, plus $60,000 toward the Attorney General's investigative costs. This new database will be designed to replace the Ingenix databases. WellPoint further promised to stop using the Ingenix database to set UCR amounts.

61. Upon information and belief, UnitedHealthcare also agreed to pay approximately $350 million to settle claims brought by a class of consumers and providers, the AMA and others, related to the underpayment of UCR amounts for out-of-network health care services.

62. Upon information and belief, WellPoint is also under investigation by the Connecticut Attorney General's office related to WellPoint's payment of certain out-of-network claims.

63.     Upon information and belief, other insurers remain under investigation by the New York Attorney General for similar conduct.

64.     Congress also is actively investigating the use of Ingenix's databases in setting UCR amounts.  Recently, the Senate Committee on Commerce, Science, and Transportation held full committee hearings on "Deceptive Health Insurance Industry Practices – Are Consumers Getting What They Paid For?"  The Committee held two such hearings, the first on March 26 and the second on March 31, 2009, examining how the health insurance industry reimburses consumers for out-of-network health care services; specifically, how the industry calculates the UCR rates for out-of-network non-MD health care providers.   The statements and archived webcast are available at http://commerce.senate.gov/public/index.cfm?FuseAction=Hearings.Hearing&Hearing _ID=4edbd03a-bf22-4783-87db-dfd57d980123 (March 26, 2009 Hearing) and http://commerce.senate.gov/public/index.cfm?FuseAction=Hearings.Hearing&Hearing_ ID=63b0f558-ec43-4ab8-82f0-070bcc699e38 (March 31, 2009 Hearing) (SR-253).

65.     At the March 31, 2009 hearing, Senator and Committee Chairman John D. Rockefeller, IV, speaking for the majority of the Senate Committee, explained why they believed the insurance industry's practices were "deceptive."  Mr. Rockefeller noted that more than 100 million Americans paid for health insurance that would give "them the option of going outside of their provider networks for care," but that the insurance companies were not living up to their end of the bargain:

> Let's be very clear about this.  The insurers aren't letting their policyholders see non-network doctors out of the goodness of their hearts.  Consumers are paying for this option - through higher premiums and higher cost sharing.  There are many reasons American consumers decide to pay the extra money for health insurance with an out-of-network option.   One New York consumer we heard from last week, Dr. Mary Jerome, said she paid extra for the "peace of mind" that she could get the best care available when she really needed it.
>
> What we learned at our first hearing was that while consumers held up their side of the bargain, the insurers did

not. The insurance industry promised to base their out-of-network payments on what they call the "usual, customary, and reasonable" cost of medical care in a particular area. Thanks to the New York investigation and other lawsuits, we now know that the insurance companies were not delivering what they promised.

66. Senator Rockefeller specifically addressed the New York Attorney General's findings as to the insurance industry's use of Ingenix's databases to pay far less than the UCR amounts:

> In Erie County, New York, for example, insurance companies were reimbursing their policyholders for doctor visits at rates that were 15 to 25% below the local prevailing rates. A federal judge recently concluded that the reasonable and customary data insurers used in New Jersey was 14.5% lower than the prevailing market rates. Everywhere experts have looked at this data, they have found what statisticians call a "downward skew" in the numbers. For ten years or even longer, this skewed data was used to stick consumers with billions of dollars that the insurance industry should have been paying. The source of the skewed data was Dr. Slavitt's company, Ingenix.

67. In light of the insurance industry's fraudulent use of Ingenix's databases in setting UCR rates, the Senate Committee is currently evaluating whether more federal oversight and regulation of the insurance industry is necessary. For now, however, the only avenue of redress for insureds and their health care providers, such as Plaintiffs and the Class, is through the courts.

## VI. PLAINTIFF JAMES A. PECK, PSY.D.

68. Plaintiff, Dr. James Peck, Psy.D., is a Clinical Psychologist who resides in Marina Del Rey, California and maintains a private practice in Santa Monica, California. Dr. Peck also works at UCLA in Los Angeles, California. One of Dr. Peck's areas of focus is in substance abuse treatment. He completed a three-year National Institute of Health/National Institute on Drug Abuse (NIH/NIDA) Postdoctoral Fellowship at UCLA and holds the American Psychological Association/College of Professional Psychology Certificate of Proficiency in the Treatment of Alcohol and other Psychoactive Substance

Use Disorders. Dr. Peck is also a member of an internationally recognized substance abuse research group at the David Geffen School of Medicine at UCLA. He also specializes in HIV prevention for high risk populations and served as the Principal Investigator of a NIDA-funded study of an intervention for methamphetamine-abusing HIV-positive patients at the UCLA CARE Clinic.

69. As part of his private practice, Dr. Peck has obtained assignments of benefit payment rights from insureds covered under WellPoint employer sponsored and non-employer sponsored health care plans, and for such plans where WellPoint functions as a plan administrator under ERISA. Dr. Peck asserts claims as a member of the Class and Sub-Class for unpaid UCR amounts due him under these assigned claims.

70. At all relevant times, Dr. Peck was an out-of-network health care provider to insureds covered by WellPoint's plans, and remained free to charge his patients his actual charges for medical services rendered. During that time, Dr. Peck had no direct contractual relationship with WellPoint. His experience with WellPoint was typical of other Class Members' experiences during the Class Period.

71. Because he was not in WellPoint's network of preferred providers, Dr. Peck, like other Class Members, obtained a claim assignment from his patients, through which he was paid directly by WellPoint for providing health care to its insureds. These claim assignments did not alter the legal relationship between WellPoint and its insureds, but rather provided the convenience of allowing its insureds to obtain needed health care on the implicit promise of later payment by WellPoint.

72. The assignment of benefit forms that Dr. Peck and Class Members obtain from their WellPoint patients are security for future payment by WellPoint and direct WellPoint, as the patient's insurer, to pay the benefit claim directly to the out-of-network health care provider. Dr. Peck could and did check claim coverage and obtain pre-authorization from WellPoint before performing services for WellPoint's insureds, but

like other Class Members, Dr. Peck was not told WellPoint's intended UCR reimbursement amount. Payment was unknown and frequently not automatic – unlike the services WellPoint has obtained for its insureds.

73. Dr. Peck, like other Class Members, submitted his claims to WellPoint using standardized procedural codes such as CPT Codes, HCPCS (Healthcare Common Procedure Coding System) Codes, and modifiers, as needed, on a HCFA form 1500 (n/k/a, CMS 1500). These claims were submitted to WellPoint either in paper form or electronically and may or may not have been immediately processed by an electronic clearinghouse before reaching WellPoint. Dr. Peck could submit larger claims to WellPoint on paper using the U.S. Mail.

74. Dr. Peck receives EOBs from WellPoint indicating that his bills and his patients' claims were processed and/or administered by Anthem Blue Cross. For example, Dr. Peck billed Anthem Blue Cross $150.00 on April 1, again on April 11 and again on April 29, 2009, for Procedure Code 90806 services he performed on each of those three days. Anthem Blue Cross did not pay him $150.00. Instead, on May 21, 2009, Anthem Blue Cross issued an EOB indicating that it reduced the allowable amount down to $107.13 on the false premise that it represented the UCR amount for out-of-network providers.

75. With respect to the UCR reductions WellPoint and its subsidiary Anthem Blue Cross imposed on Dr. Peck, any exhaustion of administrative remedies with respect to the UCR determination would be futile, because WellPoint, as a matter of policy, refuses to alter or reprocess claims that have been processed pursuant to the Ingenix database. Indeed, Dr. Peck has called Anthem Blue Cross at the number provided on its EOB and challenged the "allowed amount" as unreasonable and below the UCR amount for Los Angeles metropolitan area. Anthem Blue Cross advised Dr. Peck that the "allowable amount" was all he was entitled to be paid as an out-of-network provider in

1  that geographical area.  Alternatively, Dr. Peck should be deemed to have exhausted any

2  claims that otherwise were not exhausted, due to WellPoint's inadequate disclosure

3  concerning grievance procedures and its violation of ERISA and the applicable ERISA

4  regulations.

5  ### VII.   CLASS ALLEGATIONS

6  76.   Individual Plaintiff brings this action on behalf of himself and all others

7  similarly situated under Rule 23 of the Federal Rules of Civil Procedure. The

8  requirements of subparts 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil

9  Procedure are met.

10  77.   Individual Plaintiff brings this action on behalf of the following class:

11  All out-of-network health care providers, who are not
12  licensed medical doctors or doctors of osteopathy, practicing
   in the United States, and who, during the Class Period,
   submitted claims to WellPoint for payment of their health
13  care services to WellPoint's insureds, and were paid less than
   the amount submitted on their claims, hereinafter collectively
14  referred to as the "Class" or "Class Members."

15  78.   Individual Plaintiff also brings this action on behalf of an ERISA sub-class

16  defined as follows:

17  All out-of-network health care providers, who are not
18  licensed medical doctors or doctors of osteopathy, practicing
   in the United States, and who, during the Class Period,
19  submitted claims to WellPoint for payment of their health
   care services to WellPoint's insureds under a group health
   plan subject to ERISA that was insured or administered by
20  WellPoint, and were paid less than the amount submitted on
   their claims, hereinafter collectively referred to as the "Sub-
21  Class" or "Sub-Class Members."

22  79.   The non-MD health care providers include chiropractors, podiatrists,

23  physical therapists, psychologists, optometrists, and other providers who are not licensed

24  physicians.

25  80.   Membership in the Class is so numerous that joinder of all members is

26  impracticable.  Although the number of Class Members and their names are presently

27

unknown, this information can be readily determined from WellPoint's records.  Upon information and belief, the Class includes thousands of out-of-network providers nationwide.  Based on reasonable estimates, the numerosity requirement of Rule 23 is easily satisfied.

81.    There are numerous and substantial questions of law and fact common to all Class Members that control this litigation and predominate over any individual issues.  Common questions of law and fact include, but are not limited to:

- Whether WellPoint correctly calculated out-of-network UCR rates when it used Ingenix;

- Whether WellPoint's use of the Ingenix database to calculate out-of-network UCR reimbursement rates is unlawful;

- Whether WellPoint's failure to properly disclose its out-of-network pricing methodology in its EOBs and/or EOPs, as well as its failure to disclose the numerous flaws in the Ingenix databases it used to calculate UCR rates is unlawful;

- Whether WellPoint engaged in racketeering;

- Whether WellPoint engaged in anti-competitive conduct;

- Whether Individual Plaintiff and the Class have been damaged;

- The proper method for calculating the damages suffered by Individual Plaintiff and the Class; and

- Whether Plaintiffs and the members of the Class are entitled to declaratory, injunctive and/or other equitable relief.

82.    Individual Plaintiff is a member of the Class and will fairly and adequately protect the interests of the members of the Class, is committed to the vigorous prosecution of this action, has retained counsel competent and experienced in class action, RICO and ERISA litigation and has no interests antagonistic to or in conflict with those of the Class or Sub-Class.  For these reasons, Plaintiff is an adequate Class representative.

83.     Plaintiff's claim is typical of the Class Members' claims, and is based on and arises out of a uniform pattern or practice as described above.   If litigated individually, the claims of each Class Member would require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief. WellPoint's actions are therefore generally applicable to the Class as a whole, and Individual Plaintiff seek equitable remedies with respect to the Class as a whole, within the meaning of Fed. R. Civ. P. 23(b)(2).

84.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, the damages suffered by individual Class Members may be relatively small in comparison with the expense and burden associated with individual litigation, which make it impossible for Class Members to individually redress the harm done to them.   Proceeding as a class action will permit an orderly and expeditious administration of the claims of Class Members, will foster economies of time, effort and expense and will ensure uniformity of decisions.   Then, once WellPoint's liability is established, the Court and a jury can determine the claims of each member of the Class. And, given the uniform policies and practices at issue, there will also be no difficulty in the management of this litigation as a class action.

## VIII.   LEGAL CLAIMS

### COUNT ONE

### (Violation of ERISA § 502(A)(1)(B))

85.     Plaintiffs hereby incorporate by reference each of the preceding paragraphs as though fully set forth herein.

86.     This claim is asserted by Associational Plaintiffs and Individual Plaintiff on his own behalf and on behalf of the Sub-Class Members.

87.     Individual Plaintiff and the Sub-Class have standing to pursue these claims because they are the assignees of their patients' out-of-network WellPoint benefits claims.

88.     The Associational Plaintiffs have standing to pursue these claims on behalf of their members through associational standing.

89.     During the Class Period, WellPoint breached its plan provisions for benefits by underpaying UCR and other out-of-network reimbursement amounts in ERISA health care plans to Plaintiff, the Sub-Class and the Associational Plaintiffs' members in violation of § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

90.     Defendants' breaches included, among other things, the misuse of the Ingenix database and other improper methods such as using Medicare data to calculate UCR amounts paid to out-of-network providers for health care services.

91.     Under the terms of its health plans, WellPoint administers benefits and is a fiduciary.

92.     In certain self-insured plans (aka Administrative Services Only or "ASO"), WellPoint makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion (hereinafter "discretion") concerning benefits.

93.     Where WellPoint acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, WellPoint is liable for underpaid benefits to Plaintiffs and the Sub-Class in both fully insured and ASO ERISA health plans.

94.     Pursuant to 29 U.S.C. § 1132(a)(l)(B), Plaintiffs seek declaratory relief and Individual Plaintiff and the Sub-Class are entitled to recovery for unpaid benefits relating to WellPoint's violation of the terms of its health care plans.

. . .

. . .

**COUNT TWO**

**(Violations of RICO, 18 U.S.C. 1962(c))**

95.     Plaintiffs hereby incorporate by reference each of the preceding paragraphs as though fully set forth herein.

96.     This claim is asserted by Individual Plaintiff on his own behalf and on behalf of the Class Members.

97.     Individual Plaintiff and the Class have standing to pursue this claim as assignees of their patients' out-of-network WellPoint benefits and as third party beneficiaries of their patients' out-of-network WellPoint benefits.

98.     At all relevant times, WellPoint was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

99.     At all relevant times, and as described in this Complaint, WellPoint carried out its underpayment scheme to defraud Plaintiff and the Class in connection with the conduct of an association-in-fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), comprised of WellPoint and Ingenix (the "Enterprise").

100.     At all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

101.     As described herein, the Enterprise has and continues to have an ascertainable structure and function separate and apart from the pattern of racketeering activity in which WellPoint has engaged.  In addition, the members of the Enterprise function as a structured and continuous unit, and performed roles consistent with this structure. The members of the Enterprise performed certain legitimate and lawful activities that are not being challenged in this Complaint, including the provision of health insurance and plan and claims administration services by WellPoint, which was done for many claims lawfully and without resort to unlawful practices. However, the creation, use and dissemination of invalid data for use in making UCR determinations

was not lawful or legitimate. In addition to the legitimate activities carried out by the members of the Enterprise, its members used the Enterprise's structure to carry out the fraudulent and unlawful activities alleged in this Complaint including, but not limited to, the intentional underpayment of benefits to Plaintiff and the Class resulting from WellPoint's use of flawed and invalid data for its UCR determinations.

102. The purpose of the Enterprise was to create a means by which WellPoint could reduce payments to Individual Plaintiff and the Class for out-of-network services through the use of flawed and invalid data that could not easily be challenged. The Enterprise created the Ingenix database which appeared to be a valid database that reported actual charge data when, in fact, it was comprised of invalid and flawed data. Through their roles in the Enterprise, Ingenix directly benefited from the licensing fees it earned from the sale of the Ingenix databases and indirectly through the monies saved by UnitedHealthcare, its parent corporation. WellPoint benefited by reducing the amount of benefits it paid to Individual Plaintiff and the Class for their out-of-network services through the use of the Ingenix database for its UCR determinations.

103. As alleged herein, although Ingenix issues a disclaimer to the users of the Ingenix databases, WellPoint continued to use the Ingenix databases in a manner directly at odds with the disclaimer. Ingenix knew that its data users were using the Ingenix databases improperly to make UCR determinations but failed to stop it. At the same time it was issuing a disclaimer in a misguided effort to provide itself (and UnitedHealthcare) with legal protection, Ingenix also was promoting the Ingenix databases as a cost-saving mechanism for those insurers (such as WellPoint) who used and relied upon it in making UCR determinations. In fact, Ingenix provided extensive "litigation support" to its data users, including vouching for data used to price their UCR amounts. Ingenix employed staff to assist data users, including testifying in court, testifying in depositions, supplying documentation and otherwise bolstering the users' use of Ingenix data to price UCR.

Thus, Ingenix ignored its own disclaimer, as did its users, despite the fact that the disclaimer correctly stated that the Ingenix database could not be used as a basis for making UCR determinations.

104.    Ingenix and WellPoint knew that the UCR data was invalid because, *inter alia*, Ingenix only used the four basic data points discussed above to produce the final Ingenix database.   Nonetheless, WellPoint continued to send the four data points to Ingenix and Ingenix continued to use the four data points to create the invalid Ingenix database which WellPoint used to under price UCR amounts.

105.    Ingenix not only sought and accepted WellPoint's incomplete data, but it continued to provide a significant database discount to WellPoint.  Ingenix also provided "litigation support" for UCR pricing determinations made by WellPoint using the Ingenix data.   And, Ingenix failed to conduct any audits or reviews of the data it received from data contributors, including WellPoint.   These actions were done in furtherance of Ingenix's effort to understate UCR amounts for the benefit of the WellPoint-Ingenix Enterprise.

106.    Defendants' submission of data to Ingenix benefited Ingenix, and users of the Ingenix databases, including WellPoint.

107.    Ingenix and WellPoint knew that the Ingenix databases were being used without Individual Plaintiff or the Class ever being informed of the disclaimer or the inherent flaws in the Ingenix databases. For example, WellPoint falsely reported to Individual Plaintiff and Class Members, via U.S. mail and interstate wire communications, that its reductions in amounts paid for out-of-network services were based on UCR amounts when, in fact, the reductions were based on flawed and invalid numbers obtained from the Ingenix databases that substantially underreported UCR amounts.

. . .

108. During the Class Period, WellPoint participated in the conduct of the Enterprise to shift the costs of medical treatment from WellPoint to its insureds and therefore to Individual Plaintiff and the Class, to reduce WellPoint's UCR payments and to create an appearance of legitimacy for its out-of-network benefit reductions. Using U.S. mail and interstate wire facilities, WellPoint provided false and misleading information to Individual Plaintiff and the Class to convert those withheld funds for the Enterprise's own direct and indirect financial gain, and to discourage its insureds from using out-of-network non-MD health care providers. Because WellPoint saves money when services are provided by in-network non-MD providers, the operations of the Enterprise saved WellPoint money at the expense of non-MD providers like Individual Plaintiff and the Class who were out-of-network. In turn, the Enterprise benefited from the pattern of racketeering activity through the reduction of UCR costs by WellPoint and other users of the Ingenix databases, which would not have been obtained without entry into the Enterprise and was, in addition to the conduct of WellPoint alleged above, the shared goal of the Enterprise for which its members functioned as a continuous unit.

109. WellPoint, acting through its officers, agents, employees and affiliates, has committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(5), prior to and during the Class Period, and continues to commit such predicate acts, in furtherance of its underpayment scheme for out-of-network services, including (a) mail fraud, in violation of 18 U.S.C. § 1341, and (b) wire fraud, in violation of 18 U.S.C. § 1343. Such predicate acts include the following:

(a) mailing, causing to be mailed and/or knowingly agreeing to the mailing of various materials and information including, but not limited to, letters regarding preauthorization approval(s) and/or appeals and materially false and misleading UCR determinations, EOBs and/or EOPs and remittance advices for the purpose of saving WellPoint money at the expense of Individual Plaintiff and the Class,

with each such mailing constituting a separate and distinct violation of 18 U.S.C. § 1341; and

(b)    transmitting, causing to be transmitted and/or knowingly agreeing to the transmittal of various materials and information including, but not limited to, preauthorization approvals; materially false UCR determinations and related explanation of such determinations, by means of telephone, facsimile and the Internet, in interstate commerce, for the purpose of effectuating the above-described false payment schemes, and each such transmission constituting a separate and distinct violation of 18 U.S.C. § 1343.

110.    In furtherance of its scheme to reduce out-of-network provider benefits below the level it was otherwise contractually required to pay, using the U.S. mail and/or interstate wire facilities, WellPoint also submitted fraudulent certifications to Ingenix concerning its data.  WellPoint falsely attested to the accuracy of the data it submitted to Ingenix's databases despite the fact that it maintained internal policies prohibiting substantial data from being included in its submission to Ingenix.  The impact of WellPoint's data manipulation was to lower the amount of the reported charges so as to reduce the ultimate numbers that Ingenix would report and which WellPoint would use for making its UCR determinations.  This information was material and was withheld by WellPoint from Individual Plaintiff and the Class.

111.    WellPoint used the U.S. Mail to send EOBs and/or EOPs to Individual Plaintiff and the Class that showed UCR benefit reductions but did not sufficiently disclose the basis for WellPoint's exclusion or reduction of charges, which prevented Individual Plaintiff and the Class from learning the information needed to challenge or successfully appeal WellPoint's UCR amount determinations.  WellPoint concealed the identity of the database, type of data or other methodology upon which it relied in

determining UCR amounts.  WellPoint also failed to provide other information required under ERISA.

112.  WellPoint also used the U.S. Mail to send Individual Plaintiff and the Class intentionally incomplete and misleading correspondence denying or reducing their claims and appeals, which again failed to identify the Ingenix databases as the basis for those denials.

113.  WellPoint directs (on its EOBs and/or EOPs) insureds and providers to call its toll free telephone number if they have questions about the claim at issue.  WellPoint also maintains a public website wherein it fraudulently and misleadingly represented to WellPoint's insureds and providers that it made UCR determinations based on the prevailing charges of what other providers charged for similar services.  WellPoint's website further misrepresented that WellPoint would consider factors that it, in fact, does not consider, such as the provider's specialty and, that it will consider the prevailing charges in other areas if only a small number of charges or providers submitting charges have been submitted in that particular geographic area.  These statements, as disseminated to Individual Plaintiff and the Class on WellPoint's Internet website (which uses interstate wire facilities) were false.

114.  As demonstrated by the foregoing allegations, WellPoint, in violation of 18 U.S.C. §§ 1341, 1343, 1961 and 1962, repeatedly and regularly used the U.S. Mail and interstate wire facilities to further all aspects of the intentional underpayment to Individual Plaintiff and the Class by delivering and/or receiving materials necessary to carry out the scheme to defraud Individual Plaintiff and the Class.

115.  WellPoint's representations were knowingly false and misleading. WellPoint knew and recklessly disregarded that its methodology for establishing out-of-network UCR amounts, which was to rely primarily on Ingenix's databases, was inherently flawed; that Ingenix's databases were incapable of accurately calculating

UCR levels; and that WellPoint did not have a valid basis upon which to represent that the bills submitted by out-of-network non-MD health care providers' were "greater than the reasonable and customary charge" or the "prevailing charge level" for the relevant services in a particular geographic area.

116. Despite its mutual knowledge that the Ingenix data did not accurately determine UCR amounts, WellPoint both defended the Ingenix data when questioned about UCR determinations based on it and by agreement relied on Ingenix to provide detailed "support" so it could defend its use of Ingenix data. Ingenix promised to supply witnesses in court if WellPoint's use of Ingenix data were challenged. In the course of appeals and other questions from WellPoint's insureds, Ingenix provided graphs and other details, vouching for the accuracy and legitimacy of its data. WellPoint then used the detail from Ingenix to vouch for the Ingenix data to the WellPoint insured or provider who was questioning UCR amounts.

117. The foregoing communications, sent via U.S. Mail and interstate wire facilities, had the design and effect of preventing a meaningful evaluation and review of the Enterprise's UCR amount determinations, and/or otherwise were incident to an essential part of WellPoint's scheme to defraud Individual Plaintiff and the Class described in this Complaint. Further, WellPoint used these written communications to provide an appearance of legitimacy and regularity, and/or postpone ultimate discovery and complaint of its underpayment scheme for out-of-network services, thereby making their discovery less likely than if such mailings or wire transmission had taken place.

118. As named fiduciaries and claims administrators of various of the WellPoint plans, WellPoint occupied and occupies a position of trust and it had, and has, a special relationship with its insureds, and therefore with Individual Plaintiff and the Class, that requires it to accurately represent the terms and conditions of its health plans,

and to disclose all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

119.    Each use of the U.S. Mail and interstate wire facilities alleged in this Complaint constitutes a separate and distinct predicate act of "racketeering activity" and, collectively, constituted a "pattern of racketeering activity."

120.    The above-described acts of mail and wire fraud are related because they each involve common members, common out-of-network claim practices, common results impacting upon common victims, and are continuous because they occurred over several years, and constitute the usual practice of WellPoint and the Enterprise, such that they amount to and pose a threat of continued racketeering activity.

121.    If WellPoint had not participated in the conduct of the Enterprise, WellPoint could not have saved the millions of dollars it did by using the Ingenix databases for making UCR determinations even though it knew that they were flawed and invalid. By using the Ingenix database for making its UCR determinations, misrepresenting them, through use of the U.S. mail and interstate wire facilities, as providing a valid and unassailable basis for such decisions, and deterring its insureds from challenging or otherwise raising questions over how it set UCR amounts, WellPoint was able to benefit substantially from its role in assisting the control and direction of the Enterprise, along with Ingenix and UnitedHealthcare.

122.    WellPoint issued false and misleading letters to providers regarding benefits, as well as false and misleading EOBs and/or EOPs. WellPoint made out-of-network benefit reductions that were contrary to the law. WellPoint knew that the data it contributed to Ingenix was inadequate and lacked required data fields essential for Ingenix to evaluate the data and include (or exclude) it in final UCR fee schedules, but WellPoint continued to use the Ingenix databases to make UCR determinations anyway.

123.    In furtherance of its underpayment scheme for out-of-network services, WellPoint, in violation of 18 U.S.C. §§ 1341, 1343, 1961 and 1962, repeatedly and regularly used the U.S. mail and interstate wire facilities to further all aspects of the intentional underpayment to Individual Plaintiff and the Class by delivering and/or receiving materials necessary to carry out the scheme to defraud Individual Plaintiff and the Class.

124.    The direct and intended victims of the pattern of racketeering activity described herein are Individual Plaintiff and the Class, whom WellPoint has underpaid for out-of-network services.

125.    Individual Plaintiff and the Class were injured by reason of WellPoint's RICO violations because they were underpaid for services rendered to WellPoint's insureds and were forced to exhaust significant time and resources addressing WellPoint's wrongful practices. WellPoint further deprived Individual Plaintiff and the Class of the knowledge necessary to adequately challenge the underpayments. Their injuries were proximately caused by WellPoint's violations of 18 U.S.C. § 1962(c) because they were the foreseeable, direct, intended and natural consequence of WellPoint's RICO violations (and commission of underlying predicate acts) and, but for WellPoint's RICO violations (and commission of underlying predicate acts), Individual Plaintiff and the Class would not have suffered these injuries.

126.    Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Individual Plaintiff and the Class are entitled to recover threefold their damages, costs and attorneys' fees from WellPoint and other appropriate relief.

. . .

. . .

. . .

. . .

## COUNT THREE

### (Breach of Fiduciary Duties of Loyalty

### & Due Care In Violation of ERISA § 404)

127. Plaintiffs hereby incorporate by reference each of the preceding paragraphs as though fully set forth herein.

128. This claim is asserted by Associational Plaintiffs and Individual Plaintiff on his own behalf and on behalf of the Sub-Class Members.

129. Individual Plaintiff and the Sub-Class have standing to pursue this claim as assignees of their patients' out-of-network WellPoint benefits.

130. The Associational Plaintiffs have standing to pursue these claims on behalf of their members through associational standing.

131. Pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, WellPoint acted and continues to act as a fiduciary of its insureds' health plans, as well as a fiduciary for self-insured plans, by, *inter alia*, deciding final appeals.

132. In its role as a fiduciary, WellPoint owes Plaintiffs and the Sub-Class a duty of care that requires it to act prudently, with the care, skill, prudence and diligence that a prudent fiduciary would use in the conduct of an enterprise of like character. In this role, WellPoint must also ensure that it complies with the documents and instruments governing its plan(s), in accordance with § 404(a)(l)(B) and (D) of ERISA, 29 U.S.C. § 1104(a)(l)(B) and (D). WellPoint failed to do so, and has violated its fiduciary duty of care to its insureds.

133. As a fiduciary of health plans under ERISA, WellPoint also had a duty of loyalty to Plaintiffs and the Sub-Class, which required it to make decisions in the interest of its insureds, not itself, and to avoid self-dealing or financial arrangements that would benefit WellPoint at the expense of its insureds, in accordance with § 406 of ERISA, 29

U.S.C. § 1106.  WellPoint therefore could not make health care benefit decisions to save money at the expense of its insureds.

134.  Nevertheless, WellPoint violated its fiduciary duty of loyalty by, *inter alia*, using the Ingenix database, during the Class Period, to benefit itself at the expense of its insureds and in a manner contrary to its contractual obligations.  WellPoint further violated this duty by not disclosing material information to its insureds, such as, *inter alia*, that it was determining UCR rates using the flawed Ingenix databases.  As the largest data contributor to Ingenix databases, WellPoint knew many of the flaws, outlined above, that made that data improper for establishing UCR amounts.

135.  WellPoint used the U.S. mail and interstate wire, during the Class Period, to make representations, *inter alia*, about Ingenix's databases that it knew were false.

136.  Plaintiffs and the Sub-Class may assert a claim for relief for WellPoint's violation of its fiduciary duties under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), including declaratory relief, and may seek removal of any fiduciary that breached its duties.

## COUNT FOUR

### (Violations of § 664 of RICO)

137.  Plaintiffs hereby incorporate by reference each of the preceding paragraphs as though fully set forth herein.

138.  This claim is asserted by Individual Plaintiff on his own behalf and on behalf of the Sub-Class Members.

139.  Individual Plaintiff and the Sub-Class have standing to pursue this claim as assignees of their patients' out-of-network WellPoint benefits and as third party beneficiaries of their patients' out-of-network benefits.

. . .

. . .

140.     Section 1961(1)(B) of RICO specifically identifies as a predicate act "any act which is indictable under ... [§] 664 (relating to embezzlement from pension and welfare funds)."  18 U.S.C. § 1961(l)(B).  Section 664 of Title 18 provides:

<u>Theft or embezzlement from employee benefit plan</u>

> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

141.     Each of the WellPoint health care plans which is an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(1)(A), and otherwise is subject to "any provision" of Title I of ERISA is included in this Count.

142.     Each of the WellPoint health care plans that is subject to ERISA or is a non-ERISA plan funded by insurance coverage WellPoint provides or administers, is subject to Section 664 of Title 18. The applicable plan documents expressly state that all benefits due under the plan terms will be paid and that the underlying benefits they expressly guarantee are plan assets.

143.     The governing plan documents warrant that all benefits due under the plans will be paid. By improperly reducing payments on out-of-network claims, WellPoint intentionally caused Individual Plaintiff and the members of the Sub-Class to be underpaid guaranteed benefits to which they were otherwise entitled in accordance with the terms of WellPoint's group health plans.

144.     For fully insured health care plans, in which WellPoint both administered the plans and paid the benefits from its own assets, WellPoint benefited from the conversion of assets from its ERISA plans. Whereas these assets should have been held by WellPoint in its fiduciary capacity under ERISA and non-ERISA plans and paid to its insureds, WellPoint improperly withheld such funds and maintained them as part of its

own assets for WellPoint's own benefit. For self-funded health care plans, WellPoint made final appeal decisions and intentionally caused underpayment of benefits to Individual Plaintiff and the Sub-Class in order to justify its receipt of administrative fees. Ingenix benefited indirectly through the savings generated by its parent, UnitedHealthcare, and directly through the licensing fees it received from WellPoint and other insurers who used the flawed Ingenix databases to commit RICO violations.

145. Defendants acted with specific intent to deprive Individual Plaintiff and Sub-Class Members of guaranteed benefits, and were sufficiently aware of the facts to know that they were acting unlawfully and contrary to the trust placed in them by Plaintiffs, Sub-Class Members and the insureds whose plans they were administering.

146. Each false payment on a claim constituted a separate and distinct predicate act, in violation of 18 U.S.C. § 664, of converting or misappropriating funds specifically earmarked within the applicable plan as a guaranteed benefit for the intended insured, for WellPoint's direct or indirect benefit.

147. As set forth above, WellPoint engaged in multiple and multi-faceted schemes, including use of the Ingenix database, to make improperly reduced payments for out-of-network services.

148. In furtherance of its false payment schemes, WellPoint, in violation of 18 U.S.C. §§ 1341 and 1343, repeatedly and regularly used the U.S. mail and interstate wire facilities to advance all aspects of the false payment schemes by delivering and/or receiving materials, including plan documents, insurance policies, summary plan descriptions, certificates of coverage, claim forms, reimbursement checks, EOBs and/or EOPs describing UCR determinations, appeal determinations, overpayment actions, pre-authorization decisions, referrals to collection agencies, representations to regulators, and other materials necessary to effectuate the false payment schemes, as well as to contribute, edit and manipulate the source data for the Ingenix databases.

149. The foregoing mail communications and wire communications contained false and fraudulent misrepresentations and omissions of material facts, and otherwise were incident to an essential part of the false payment schemes and were used to provide the false payment schemes with an appearance of legitimacy and regularity, and postpone ultimate discovery and complaints of the false payment schemes, and thereby make the discovery of the false payment schemes less likely than if no such mailings or wire transmissions had taken place, and had the design and effect of preventing a meaningful evaluation and review of WellPoint's out-of-network pricing methods.

150. As named fiduciaries and claims administrators of various of the WellPoint health care plans, WellPoint occupied and occupies a position of trust and it had, and has, a special relationship with Individual Plaintiff and Sub-Class Members that requires it to accurately represent the terms and conditions of the WellPoint health care plans, and to disclose all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

151. Each such use of the U.S. mail and interstate wire facilities constitutes a separate and distinct predicate act of "racketeering activity."

152. The above-described acts of conversion of employee benefit plan funds, and mail and wire fraud, are related because they each involved common participants, common methodologies, common results impacting upon common victims and a common purpose of executing the false payment schemes, and are continuous because they occurred over a significant period of years, and constitute the usual practice of WellPoint such that they amount to and pose a threat of continued racketeering activity.

153. The purpose of WellPoint's false payment scheme was to underpay the guaranteed benefits that were assigned to Individual Plaintiff and Sub-Class Members, and convert those withheld funds for its own direct or indirect financial gain. WellPoint created an appearance of regularity and legitimacy by providing false and incomplete

information to Plaintiff and Sub-Class Members to increase revenue through its plan and claims administration business.

154. The direct and intended victims of this pattern of racketeering activity are Individual Plaintiff and Sub-Class Members, who WellPoint deprived of the complete guaranteed benefits to which they were entitled for their out-of-network services.

155. Defendants' RICO violations injured Plaintiff and Sub-Class Members by depriving them of hundreds of millions of dollars in guaranteed benefits on their claims for reimbursement of out-of-network charges, as well as the knowledge necessary to challenge false and manipulative UCR determinations. Plaintiff's and the Sub-Class' injuries were proximately caused by WellPoint's violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and the natural consequence of WellPoint's RICO violations (and commission of underlying predicate acts), and but for Defendants' RICO violations (and commission of underlying predicate acts), Plaintiff and Sub-Class Members would not have suffered the injuries suffered by them.

156. As a result of its misconduct, WellPoint is liable to Plaintiff and the Sub-Class in an amount to be determined at trial. Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiff and Sub-Class Members are entitled to recover threefold their damages, as well as costs and attorneys' fees from WellPoint.

## COUNT FIVE

### (Violations of The Sherman Antitrust Act § 1)

157. Plaintiffs hereby incorporate by reference each of the preceding paragraphs as though fully set forth herein.

158. This claim is asserted by Associational Plaintiffs and Individual Plaintiff on his own behalf and on behalf of the Class Members.

159.    Individual Plaintiff and the Class have standing to pursue these claims because they are the assignees of their patients' out-of-network WellPoint benefits claims.

160.    The Associational Plaintiffs have standing to pursue these claims on behalf of their members through associational standing.

161.    WellPoint, Ingenix and other unnamed co-conspirators unlawfully restrain competition by, *inter alia*, fixing the price of UCR rates for out-of-network services well below the level that would exist in a truly competitive market; agreeing to universally set the UCR amount based upon Ingenix's faulty databases; and pressuring out-of-network non-MD providers to join their networks by uniformly failing to pay competitive market rates for out-of-network services.

162.    WellPoint and Ingenix have combined, conspired and/or agreed with one another, and/or with unnamed co-conspirators, to unreasonably restrain trade in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  WellPoint combined, conspired and/or agreed with its co-conspirators to artificially lower, fix or maintain the UCR amounts it paid to Plaintiffs and the Class, which constitutes a horizontal price fixing conspiracy that is a per se violation of the Sherman Antitrust Act.

163.    More specifically, WellPoint reached agreement with its competitors, including UnitedHealthcare, WellPoint, and/or a number of other non-parties to determine the UCR using primarily the Ingenix Database, as described above.

164.    UnitedHealthcare acts through its alter ego Ingenix to facilitate the direct horizontal agreements for compiling and sharing competitive information and UCR rate data among all the conspirators, including WellPoint.

165.    WellPoint and other data contributors to Ingenix are entitled to "free" use of the Ingenix databases simply for continuing to submit data at the level which they submitted data when the database was owned by HIAA.

166. WellPoint engaged in price fixing when it agreed with its competitors, including UnitedHealthcare, to utilize the same database to determine the UCR rates for health care services, which lead to them paying substantially the same reduced rates for services rendered to their insureds.

167. Typical examples of price fixing agreements include those that adopt a standard formula for computing prices and/or adhere to a minimum fee or price schedule. WellPoint did both.

168. WellPoint along with its co-conspirators adopted a standard formula for making UCR determinations, and each has agreed to a method of determining the maximum price or fee, via the Ingenix database, that it will pay for out-of-network charges. This alone amounts to a naked agreement to fix prices.

169. WellPoint's agreement gives it, collectively with its competitors, tremendous market power to set UCR at rates well below those which would exist in a competitive marketplace. In fact, no competitive pressure to raise UCR rates exists while all the conspirators act collectively to reduce prices. Without agreement and collective action between them, including the exchange and compilation of relevant pricing data, WellPoint would be unable to systematically and across the board reduce the UCR rates paid.

170. In addition to agreeing to price their UCR rates using the exact same databases, the insurers also engage in exactly parallel behavior. They have substantially similar contracts with their customers; they submit UCR rate data to the databases that they know skew the relevant UCR determinations downward; and they all utilize Ingenix databases to determine UCR rates. These parallel behaviors allow their price fixing agreement to effectively depress the UCR rate paid to providers for services rendered to their insureds, and otherwise reduce competition among would-be competitors.

171. The market is ripe for collusion, conspiracy and agreement as it is heavily concentrated, with a relatively standardized product, with numerous opportunities for the WellPoint and its co-conspirators to agree and collude, including involvement and participation in the same trade associations, and availability of the same Ingenix Databases. Additionally, because pricing information is shared among the parties, defection from the agreement is easy to detect.

172. There is virtually no incentive for WellPoint, or its co-conspirators, to compete in setting the out-of-network UCR rate. To the contrary, each conspirator benefits from reduced UCR reimbursement costs made possible by their agreement without affecting their ability to compete for customers.

173. In fact, the agreement to use the Ingenix databases for UCR determinations allows all co-conspirators to enjoy the monopoly or near monopoly status that WellPoint and some of its co-conspirators experience in certain markets due to the use of data skewed by use of the in-network negotiated charge data used in those areas.

174. WellPoint and its co-conspirators further benefit from their agreement to fix and suppress prices because the depressed UCR rates incentivizes providers to become members of their various "networks," where further cost reducing measures and other methods of control can be placed on them.

175. A market with the characteristics described above facilitates collusion and agreement to fix prices, and detection and discipline are also easy to maintain.

176. WellPoint's agreement with its competitors to use the Ingenix databases to determine UCR amounts enabled WellPoint to impose artificially low UCR rates and other anticompetitive restrictions on Plaintiffs and the Class that could not exist in a competitive market.

177. Competition between the payors also has been reduced by the agreement to improperly reduce UCR amounts.

178. Without the agreement to fix UCR rates and reduce competition among payors, Plaintiffs and the Class would be paid more for the health care services they rendered to WellPoint's insureds.

179. Nearly every major insurer uses Ingenix's databases, making it nearly impossible for providers not to be affected by WellPoint's and its co-conspirators' agreement to use the Ingenix data to fix prices and not compete. As a result, WellPoint and its co-conspirators are able to control the market in a way that reduces their costs at the expense of out-of-network non-MD health care providers to whom they pay only a fraction of what they are owed or the market demands. Because of this "price fixing" scheme, WellPoint has paid less money to Plaintiffs and the Class for their out-of-network services than they should have in a competitive market absent such a scheme.

180. WellPoint's activities, including the administration and operation of health care plans in every state in the United States, are in the regular, continuous and substantial flow of interstate commerce, and have a substantial effect upon interstate commerce.

181. WellPoint's unlawful activities, concerted actions, conspiracy to restrain trade, and agreement to fix prices substantially affect and restrain the operation of interstate commerce.

182. Out-of-network health care services are the relevant products and/or services market affected by WellPoint's conduct.

183. The United States of America is the relevant geographic market.

184. As a result of the foregoing agreement or conspiracy, WellPoint has caused Individual Plaintiff and the Class to suffer financial loss due to the fact that WellPoint pays them UCR rates that are unconscionably low and at noncompetitive levels.

185.    Individual Plaintiff and the Class are entitled to damages under 15 U.S.C. § 15, et seq., in an amount to be determined at trial, trebled, plus their costs, expenses and attorneys' fees.  Plaintiffs and the Class further seek injunctive relief in the form of order prohibiting WellPoint from engaging in the unlawful behavior described herein.

## IX.    PRAYER FOR RELIEF

WHEREFORE, the Associational Plaintiffs and Individual Plaintiff, individually and on behalf of the Class, pray for judgment against WellPoint and in their favor as follows:

A.    Certifying the Class and Sub-Class as set forth in this Complaint, and appointing Individual Plaintiff as Class representative for these classes;

B.    Declaring that WellPoint has breached the terms of its members' plans with regard to out-of-network benefits in its members' health plans, and thereby awarding damages to Individual Plaintiff and the Class for unpaid benefits in ERISA plans, as well as awarding declaratory relief with respect to WellPoint's violations of ERISA;

C.    Declaring that WellPoint is liable to Individual Plaintiff and the Class pursuant to RICO, 18 U.S.C. §§, 1962(a) and (c), 1964(c) for threefold their damages, costs and attorney fees;

D.    Enjoining WellPoint from committing the RICO violations described above in the future and/or declaring their invalidity;

E.    Preliminarily and permanently enjoining WellPoint from using the Ingenix databases, or from making UCR determinations in the absence of valid and reliable data substantiating the lesser-adjudicated claims amounts;

F.    Preliminarily and permanently enjoining WellPoint from using or causing others to use outdated Ingenix data in connection with payment of out-of-network benefit claims by WellPoint members;

G.     Preliminarily and permanently enjoining WellPoint from applying out-of-network adverse benefit determinations where its insureds' Evidences of Coverage and group health plan summary documents do not disclose or authorize them;

H.     Preliminarily and permanently enjoining WellPoint from discouraging appeals and/or deciding appeals in a manner inconsistent with federal and state law;

I.     Preliminary and permanently enjoining WellPoint from discouraging out-of-network care or placing undisclosed obstacles in the path of WellPoint members seeking to access out-of-network care;

J.     Awarding Plaintiffs and the Class the costs and disbursements of this action, including reasonable counsel fees, costs and expenses in amounts to be determined by the Court;

K.     Awarding interest from date of initial out-of-network adverse benefit determinations on all unpaid amounts;

L.     Awarding prejudgment interest; and

M.     Granting such other and further relief as is just and proper.

## X.  JURY TRIAL DEMAND

Plaintiff hereby requests a jury trial for all claims so triable.

DATED: June 23, 2009          BONNETT, FAIRBOURN, FRIEDMAN
                                     & BALINT, P.C.

/s/Tonna K. Farrar
Andrew S. Friedman (*Pro Hac Vice pending*)
Elaine A. Ryan (*Pro Hac Vice pending*)
Tonna K. Farrar (CA Bar No. 237605)
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
E-mail afriedman@bffb.com
Telephone: (602) 274-1100

GLAST, PHILLIPS & MURRAY, P.C.
Michael C. Dodge (*Pro Hac Vice pending*)
2200 One Galleria Tower
13355 Noel Road, L.B. 48
Dallas, Texas 86350
E-mail mdodge@gpm-law.com
Telephone:  (972) 419-8300

LITE, DePALMA, GREENBERG
  & RIVAS, LLC
Bruce D. Greenberg (*Pro Hac Vice pending*)
Jennifer Sarnelli (*Pro Hac Vice pending*)
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
E-mail bgreenberg@ldgrlaw.com
Telephone:  (973) 623-3000

*Attorneys for Plaintiffs*